## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| CANGREJEROS DE SANTURCE BASEBALL CLUB, LLC, SANTURCE MERCHANDISING LLC, and THOMAS J. AXON,<br><br>Plaintiffs,<br><br>v.<br><br>LIGA DE BÉISBOL PROFESIONAL DE PUERTO RICO, INC., CRIOLLOS MANAGEMENT, INC., RA12, INC., INDIOS DE MAYAGÜEZ BASEBALL CLUB INC., GIGANTES DE CAROLINA BASEBALL CLUB INC., PONCE SPORTS AND ENTERTAINMENT CORP., IMPULSE SPORTS ENTERTAINMENT CORPORATION, JUAN A. FLORES GALARZA, IN HIS CAPACITY AS PRESIDENT OF THE LIGA DE BÉISBOL PROFESIONAL DE PUERTO RICO, INC., IN HIS PERSONAL CAPACITY, AND AS A MEMBER OF THE CONJUGAL PARTNERSHIP CONSTITUTED BETWEEN HIM AND HIS SPOUSE, AND THE CONJUGAL PARTNERSHIP SO CONSTITUTED,<br><br>Defendants. | Civil Action No. 3:22-cv-01341-WGY<br><br>**JURY TRIAL DEMANDED** |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Cangrejeros de Santurce Baseball Club, LLC ("Cangrejeros LLC"), Santurce Merchandising LLC ("Santurce Merchandising"), and Thomas J. Axon ("Axon"), by their undersigned attorneys, for their First Amended Complaint (the "Complaint") allege, with knowledge as to their own actions and on information and belief as to all other allegations, as follows:

1

**INTRODUCTION**

1.      Defendant Liga de Béisbol Profesional de Puerto Rico, Inc., (the "League") is the only top-tier professional baseball league in Puerto Rico, currently consisting of six different franchise teams operated by separately owned investors who do not share profits and losses with each other.  The teams compete in the winter season with the winner going on to represent Puerto Rico in the Caribbean Series, an international baseball tournament sponsored by the Caribbean Professional Baseball Confederation.  The teams not only compete on the field for sport, but off the field in economic competition for fans, in-person attendance, player talent, sponsorships, merchandise sales, radio, and streaming broadcast rights agreements.

2.      The Complaint challenges, under both federal and Puerto Rico antitrust laws, concerted behavior in unreasonable restraint of trade through which Defendants entered into an unlawful conspiracy to boycott and exclude Plaintiffs from competing as participants in the relevant markets for investing in and operating top-tier professional baseball teams in Puerto Rico.

3.      In October 2019, Axon, through Cangrejeros LLC, purchased operating control of the Cangrejeros de Santurce professional baseball team (the "Cangrejeros Franchise")—one of the most historic and storied franchises in the history of baseball in Puerto Rico—and on February 4, 2022, became its sole owner and member.  Axon assumed control of the Cangrejeros Franchise with a vision of restoring its economic success and glory in the League—Puerto Rico's top-tier professional baseball league—which had fallen on hard times with fewer teams participating in the league's season, fewer fans attending games, stadiums in disrepair, and facilities that lacked in quality compared with other Latin American winter baseball league teams.  Axon intended to improve the competitive success of the Cangrejeros Franchise through increased levels of investment and dynamic new ways to operate and promote the team in economic competition with

the other teams that comprise the League, which enhanced competition was without precedent in the League. Such increased competition directly benefitted fans and sponsors, who would have the opportunity to consume a higher-quality professional baseball product in Puerto Rico.

4. Axon made good on his plans to effect positive, procompetitive changes to his team, the Cangrejeros Franchise. In Axon's three seasons with control over the Cangrejeros Franchise, he measurably increased player quality, improved fan experience, broadened the fan base, promoted and established new broadcasts, enhanced sponsorships, and expanded merchandising opportunities. For example, when Axon sought to have his team's games broadcast in the continental United States on the Fox Sports Network, his competing team operators resisted committing the investment necessary to fund the production costs share for their own teams. In response, Axon accepted responsibility for financing the full production costs of the broadcasts. Axon also commissioned a documentary film that aired on the Fox Sports Network titled "Béisbol: The Legends of Puerto Rico," to bring more attention not only to the Cangrejeros Franchise, but also to the League, and most importantly, to the proud baseball culture and rich history of the sport in Puerto Rico. However, the League did not support the documentary in any way. Similarly, Axon invested resources to entice higher-quality baseball players to play for the Cangrejeros Franchise by offering better salaries and superior benefits, including top-quality accommodations and transportation.

5. Axon's procompetitive efforts to improve the quality of the Cangrejeros Franchise were met with stiff resistance by the other teams in the League, who did not want to have to face such enhanced economic competition. This ultimately led to the League and its teams agreeing to a group boycott of and refusal to deal with Plaintiffs, culminating in the unlawful seizure of Plaintiffs' investor-operator interest in the Cangrejeros Franchise, which was then resold to a

different investor-operator, Defendant Impulse Sports Entertainment Corporation ("Impulse Sports"). On information and belief, Impulse Sports is a participant in the conspiracy against Plaintiffs and was given the opportunity to become the investor-operator of the Cangrejeros Franchise because, among other things, it would refrain from providing the type of aggressive competition provided by Plaintiffs against the "old boys" network that controlled the franchises in the League.

6. Defendants have entered into unlawful contracts, combinations, and/or conspiracies that have had the purpose and effect of unreasonably restraining competition and creating and maintaining a monopoly for Defendants in the relevant markets for investing in and operating top-tier professional baseball teams in Puerto Rico. This unlawful conduct has caused significant antitrust injuries to Plaintiffs in their business and property.

7. Among other things, Axon and Cangrejeros LLC have suffered the loss of their investment and control over the franchise for which they paid to obtain operating rights, have seen the value of their investments decimated by Defendants' anticompetitive actions, and have lost access to the intellectual property in which they invested with a reasonable expectation of recoupment. At the same time, Defendants' anticompetitive activities have caused competitive injury to fans, business partners, players, and communities by reducing competition in the relevant markets and lowering the quality of top-tier professional baseball in Puerto Rico.

8. In addition to violating both federal and Puerto Rico antitrust laws, Defendants have violated the civil rights laws by acting in coordination with, and under the compulsion and color of law of, the Municipality of San Juan when they conspired with Miguel Romero Lugo, the mayor of San Juan, to deprive Plaintiffs of their property interests in the Cangrejeros Franchise without compensation or due process of law.

4

9.      Plaintiffs seek two forms of relief.  First, Plaintiffs seek a declaratory judgment and permanent injunction which would, among other things, return the investor-operator interest in the Cangrejeros Franchise to Axon and Cangrejeros LLC, restore competition in the relevant markets, and declare Defendants' actions to be a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; the Civil Rights Act, 42 U.S.C. § 1983; the Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 257, et seq.; and the tort of Contracts in Prejudice of a Third Person.  Second, Plaintiffs seek treble damages under the Clayton Act, 15 U.S.C. § 15, and the Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 268, compensatory damages and punitive damages under 42 U.S.C. §§ 1983 and 1988, and damages for violations of the Puerto Rico Fair Competition Law, P.R. Laws Ann. tit. 10, § 259, and the tort of Contracts in Prejudice of a Third Party under the Puerto Rico General Tort Statute, P.R. Laws Ann. tit. 31, §§ 10801 and 10803, for the injuries they have suffered in their business and property as a result of Defendants' unlawful actions.

10.     No sports organizations are above the law, and this includes Defendants' monopolization of top-tier professional baseball in Puerto Rico.

## PARTIES

### Plaintiffs

11.     Plaintiff Axon is a resident of San Juan, Puerto Rico.  At all times relevant to the events at issue in this Complaint, Axon has been the sole member and chairman of Cangrejeros LLC.  In this capacity, Axon maintained all ownership rights and responsibilities for the operation of Cangrejeros LLC and, by extension, for the investment and operation rights of the Cangrejeros Franchise, until Defendants conspired to unlawfully remove Axon and Cangrejeros LLC from their investments in and control over the Cangrejeros Franchise.

12.     Plaintiff Cangrejeros LLC is a limited liability company organized under the laws of the Commonwealth of Puerto Rico with registration number 433575 and its principal place of

5

business at 70 Ave. Ponce de León, Suite 160, San Juan, Puerto Rico 00918.  Cangrejeros LLC controlled the operations of the Cangrejeros Franchise as an investor-operator by virtue of a contractual agreement with the League that gave it all of the rights of an investor-operator.

13.     Plaintiff Santurce Merchandising is a limited liability company organized under the laws of the Commonwealth of Puerto Rico with registration number 448681 and its principal place of business at 33 Bolivia St., Suite 7A, San Juan, PR 00917.  At all times relevant to the events at issue in this Complaint, Santurce Merchandising has been owned and operated by Plaintiff Axon. Santurce Merchandising was formed on August 7, 2020, for the purpose of managing the sponsorship, merchandising, and certain other rights of the Cangrejeros Franchise, which it derived from its representation of the other Plaintiffs and its common ownership by Axon.

**Defendants**

14.     Defendant League is a corporation organized under the laws of the Commonwealth of Puerto Rico with registration number 4437.  Its primary place of business is Edificio Cobián's Plaza Suite GM-7, Ave. Ponce de León, San Juan, Puerto Rico 00919.  Its resident agent is José A. Nazario Álvarez.

15.     The League is the only top-tier professional baseball league in Puerto Rico.  The League is colloquially called a "winter league"—along with a group of other Latin American professional baseball leagues—and consists of six franchises, controlled by separate investor-operators, participating in a championship season that usually takes place from November to January.  The team that wins the League championship each year earns the right to participate in the Caribbean Series—the most prestigious professional baseball tournament in Latin America. For the 2022-23 season, the League is expected to field six teams, including the Cangrejeros Franchise.

16.    Defendant Criollos Management, Inc. is a corporation organized under the laws of the Commonwealth of Puerto Rico with registration number 191820. Its primary place of business is Parque Sola Morales, Caguas, Puerto Rico 00725. Its president is Raúl Rodriguez. The corporation competes in the League by virtue of its rights as an investor-operator for the Criollos de Caguas Franchise (the "Criollos").

17.    Defendant RA12, Inc. is a corporation organized under the laws of the Commonwealth of Puerto Rico with registration number 447974. Its primary place of business is Urb. Floral Park, 525 Calle Francia, Apt. 607, San Juan, Puerto Rico 00919. Its resident agent is Marisol Irizarry Pastrana, and its president is Roberto Alomar Velázquez. The corporation competes in the League by virtue of its rights as an investor-operator for the RA12 Franchise (the "RA12").

18.    Defendant Indios de Mayagüez Baseball Club Inc. is a corporation organized under the laws of the Commonwealth of Puerto Rico with registration number 411636. Its primary place of business is Estadio Isidoro García, Avenida Duscombe, Mayagüez, Puerto Rico 00681. Its president and resident agent is José J. Feliciano Prieto. The corporation competes in the League by virtue of its rights as an investor-operator for the Indios de Mayagüez Franchise (the "Indios").

19.    Defendant Gigantes de Carolina Baseball Club Inc. is a corporation organized under the laws of the Commonwealth of Puerto Rico with registration number 462381. Its primary place of business is Plaza 2 Río Cristal RB-19, Trujillo Alto, Puerto Rico 00976. Its president and resident agent is Orlando Yamir Meléndez. The corporation competes in the League by virtue of its rights as an investor-operator for the Gigantes de Carolina Franchise (the "Gigantes").

20.    Defendant Ponce Sports and Entertainment Corp. is a corporation organized under the laws of the Commonwealth of Puerto Rico with registration number 367237. Its primary place

7

of business is Coliseo Shopping Center, Suite 103, Ponce, Puerto Rico 00732.  Its president and resident agent is Oscar Misla Villalba.  The corporation competes in the League by virtue of its rights as an investor-operator for the Leones de Ponce Franchise (the "Leones").

21.    Defendant Juan A. Flores Galarza ("Flores") is of legal age, president of the League, and a resident of Puerto Rico.  His address is P.O. Box 191852, San Juan, Puerto Rico 00919.  Flores serves as the League's chief executive officer and is responsible for running its day-to-day operations.  Flores and his Spouse, whose name is unknown to Plaintiffs at this time, have a conjugal partnership constituted between them by virtue of their marriage.  Defendant Conjugal Partnership Constituted Between Flores and his Spouse ("Flores Conjugal Partnership") is made a party to these proceedings too, as Flores is also sued in his personal capacity.

22.    Defendant Impulse Sports Entertainment Corporation ("Impulse Sports") is a corporation organized under the laws of the Commonwealth of Puerto Rico with registration number 487471.  Its primary place of business is Centro Internacional de Mercadeo Torre I, 100 Carr. 165 Ste. 509, Guaynabo, Puerto Rico 00968.  Its resident agent is Lourdes Peña Sánchez, and its president is Carlos R. Iguina Oharriz.  Impulse Sports has recently acquired the investor-operator rights for the Cangrejeros Franchise that were unlawfully taken from Plaintiffs.

**Non-Defendant Co-Conspirators**

23.    Miguel Romero Lugo ("Romero Lugo") is the mayor of San Juan, Puerto Rico. Mayor Romero Lugo was elected in the general election held on November 3, 2020, and was sworn into and assumed office on January 11, 2021.  In his role as chief executive for the Municipality of San Juan, Mayor Romero Lugo is responsible for overseeing the properties of San Juan, including the stadium in which the Cangrejeros Franchise plays its home games.  When Axon and Cangrejeros LLC proposed essential renovations to improve the conditions of the stadium for fans,

Mayor Romero Lugo was the public representative responsible for San Juan's resistance to these efforts. On information and belief, Mayor Romero Lugo acted on behalf of San Juan in conspiring with the Defendants to deprive Plaintiffs of their investor-operator interests in the Cangrejeros Franchise, without any compensation or due process of law, to suppress Plaintiffs' efforts to obtain all the proposed stadium improvements or move the team to another municipality.

24.     Additional individuals, partnerships, corporations, associations, persons, and/or firms not named as Defendants in this Complaint may have also participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of these conspiracies.

## JURISDICTION AND VENUE

25.     Plaintiffs bring this action against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and P.R. Laws Ann. tit. 10, § 268, to recover treble damages and to seek injunctive relief to remedy continuing Sherman Act and Puerto Rico antitrust law violations that have damaged the business and property of Cangrejeros LLC, Santurce Merchandising, and Axon, and to recover the costs of this action, including reasonable attorneys' fees. Plaintiffs also seek actual and punitive damages, and injunctive relief, under 42 U.S.C. §§ 1983 and 1988, and P.R. Laws Ann. tit. 31, § 10803, and damages for violations of the Puerto Rico Fair Competition Law, P.R. Laws Ann. tit. 10, § 259, and the tort of Contracts in Prejudice to a Third Party, under the Puerto Rico General Tort Statute, P.R. Laws Ann. tit. 31, §§ 10801 and 10803.

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 because the claims arise under the laws of the United States: Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26), Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), and 42 U.S.C. §§ 1983 & 1988. This court has supplemental jurisdiction pursuant to

9

28 U.S.C. § 1367 over the claims arising under the Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 257, et seq., for violations of the Puerto Rico Fair Competition Law, P.R. Laws Ann. tit. 10, § 259, and the tort of Contracts in Prejudice of a Third Party under the Puerto Rico General Tort Statute, P.R. Laws Ann. tit. 31, § 10801, because these claims arise out of the same course of conduct as the federal claims.

27.    This Court has *in personam* jurisdiction over the League because the League: (a) has its principal place of business in this District; (b) has transacted substantial business in this District; (c) grants investor-operator rights to play top-tier professional baseball games in this District; (d) has engaged in an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect on commerce in this District; and (e) has had substantial aggregate contacts with the United States as a whole, including in this District.

28.    This Court has *in personam* jurisdiction over Defendants the Criollos, the RA12, the Indios, the Gigantes, and the Leones (collectively, the "Investor-Operator Defendants") because they: (a) have their principal places of business in this District; (b) have transacted substantial business in this District; (c) operate franchises that play professional baseball games in this District; (d) have engaged in an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect on commerce in this District; and (e) have had substantial aggregate contacts with the United States as a whole, including in this District.

29.    This court has *in personam* jurisdiction over Defendant Impulse Sports because it: (a) has its principal place of business in this District; (b) has transacted substantial business in this District; (c) operates a franchise that plays professional baseball games in this District; (d) has engaged in an antitrust conspiracy that is intended to have, and has had, an anticompetitive effect

on commerce in this District; and (e) has had substantial aggregate contacts with the United States as a whole, including in this District.

30.     This Court has *in personam* jurisdiction over Defendants Flores and Conjugal Partnership Constituted Between Flores and his Spouse because Flores and his Spouse reside in this District and transact substantial business in this District.

31.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because (i) Defendants are subject to this Court's personal jurisdiction with respect to this action; (ii) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; (iii) a substantial portion of the affected interstate trade and commerce has been carried out in this District; (iv) Defendants do business in, have agents in, are found in, or transact business in this District; and (v) Plaintiffs have and will continue to suffer harm in this District as a direct result of the conduct averred herein.

**FACTS RELEVANT TO PLAINTIFFS' CLAIMS**

A.     <u>**The League**</u>

32.     The League is an independent professional baseball league, the only top-tier professional baseball league in Puerto Rico, and is colloquially referred to as the Puerto Rican Winter League.  It is a member of the Caribbean Professional Baseball Confederation (the "Confederation"), which is comprised of the top-tier professional baseball leagues in the Dominican Republic, Mexico, Puerto Rico, and Venezuela, with the League serving as Puerto Rico's official representative.  Champions of each of the member league's tournaments compete in the prestigious Caribbean Series for recognition as the region's best team.

33.     The member leagues of the Confederation have entered into the Winter League Agreement with Major League Baseball ("MLB"), which sets certain standards for the play of any league recognized as a member of the Confederation.  However, the Winter League Agreement

11

expressly states that the Confederation and its member leagues and teams are not minor league affiliates of MLB.

34.     The League currently consists of six teams that have separate investor-operators and compete with each other on and off the field.  The League franchises are primarily fielded by minor league professional baseball players and unsigned prospects, with average player salaries of under $10,000.00 per winter season.

35.     The League, as the only top-tier professional baseball league in Puerto Rico, attracts a higher level of player talent than the Puerto Rico Independent Baseball League or the Liga de Béisbol Superior Doble A de Puerto Rico, the only other baseball leagues in Puerto Rico that pay anything to their players.  These leagues adhere to a semi-professional model and play a regular season schedule that overlaps with the major and minor league baseball seasons in the continental United States.  They are not considered top-tier professional baseball leagues and their players are funded with small stipends.  They do not compete in the same relevant markets as the League.

36.     The League has adopted a governing document called the Constitution of the Liga de Béisbol Profesional de Puerto Rico, Inc. (the "Constitution").  Under section 2.01(A) of the Constitution, the League contractually confers the rights to operate its franchises to private investor-operators who gain a financial interest in the revenue streams and rights of the franchises that they invest in and operate.  Defendant Flores serves as the League's president and oversees its operations as the League's chief executive officer—a role he has held at all times relevant to the events averred in this Complaint.

37.     Each of the franchises in the League has a different investor-operator that manages and exploits its revenue streams in economic competition with the other franchises in the League. The different investor-operators do not share profits and losses of their franchises with each other,

and actively compete with each other for ticket revenues from fans, revenues from sponsors, revenues from merchandising sales, and revenues from radio and streaming rights broadcasting agreements, while also competing with each other for players in the labor market.

**B.    Cangrejeros LLC Joins the League and Assumes Control of the Cangrejeros Franchise, and Its Rights, as Its Investor-Operator**

38.    On August 10, 2017, the League entered into an agreement transferring investor-operator rights for the Cangrejeros Franchise to the Sociedad Deportiva Cangrejeros de Santurce, Inc. ("Sociedad Deportiva").

39.    Cangrejeros LLC was formed on September 16, 2019, and subsequently assumed the rights and obligations of the investor-operator agreement between the League and Sociedad Deportiva in October 2019.  Cangrejeros LLC was established for the purposes of (a) owning and operating the Cangrejeros de Santurce Baseball Team and (b) transacting any and all lawful business for which a limited liability company may be organized under the Corporations Law that is incident, necessary or appropriate to accomplish the foregoing, including, without limitation, contracting for necessary or desirable services of professionals and others.  From February 4, 2022, Plaintiff Axon was the sole member and chairman of Cangrejeros LLC, which operated the Cangrejeros Franchise as its investor-operator, and which had an economic interest in all of the rights of the team.

40.    On January 21, 2021, Plaintiff Cangrejeros LLC informed the League that Lino Rivera ("Rivera") was to be the Chief Operating Officer of the Cangrejeros Franchise and that, in his new capacity, Rivera would serve as an Alternate Member of the League Board.  Axon, as sole member of Cangrejeros LLC, was also a member of the Board.

41.    On February 14, 2022, Axon's personal counsel informed Flores that Rivera and Cangrejeros employee Saúl Suárez ("Suárez") would be the franchise's representatives to the

League Board. On February 22, 2022, the Board confirmed Rivera and Suárez as members representing the Cangrejeros Franchise on the Board. This vote inadvertently revoked Axon's position on the League Board, as Axon's counsel believed that Axon held permanent Board membership in his role as sole member of Cangrejeros LLC when he informed the Board of the franchise's appointment of Rivera and Suárez as representative members.

42. The Cangrejeros Franchise plays its home games at the Hiram Bithorn Stadium (the "Bithorn") in San Juan, Puerto Rico, by virtue of an Agreement for the Administration and Operation of the Franchise, dated August 10, 2017. The Bithorn is owned and administered by the Municipality of San Juan, of which co-conspirator Romero Lugo is the mayor. The 60-year-old stadium, although emblematic of the island's rich baseball history, has suffered from poor maintenance and the impact of tropical weather in recent seasons, leaving it with a scoreboard that does not work, inadequate running water, toilets that do not work, and a roof that is falling off, among other issues.

## C.    Axon's Investment in the Cangrejeros Franchise

43. As the sole member of Cangrejeros LLC, Axon has invested heavily in initiatives to expand the competitive abilities and social responsibility of the Cangrejeros Franchise. Axon's investments were driven by both his desire to increase the ability of the team to compete economically with other teams in the League as well as by his desire to restore the prominence of baseball in Puerto Rico and to expand the fan base of the Cangrejeros Franchise.

44. Off the field, Axon's substantial personal investments in corporate social responsibility initiatives supported the Cangrejeros fan base and the community. For example, in March 2022, he pledged a contribution of $200,000.00 to form a foundation dedicated to the furtherance of amateur baseball and youth development in Puerto Rico.

45.    On the field, Axon funded production costs to broadcast all League games on the Fox Sports Network in the continental United States to reach fans of the Cangrejeros Franchise and the League in the United States market, and organized a private merchandising agreement with Lids Sports, to enable the Cangrejeros Franchise to not just sell its merchandise in Puerto Rico, but throughout the continental United States as well.  This merchandising agreement resulted in revenues of approximately $350,000.00 from team apparel sales for the Cangrejeros Franchise.

46.    In addition, Axon has been able to entice a higher caliber of player prospects to the Cangrejeros Franchise by offering greater salaries and superior team accommodations and benefits in comparison to those offered by the other League teams competing for players.

47.    Axon also proposed having his team fund a preseason exhibition tournament in October to showcase player talent across the Caribbean.  Axon met on multiple occasions with executives of teams playing in the Dominican Republic, including Águilas Cibaeñas and Tigres del Licey, and Dominican Republic league executives to discuss the structure of the preseason tournament.  These conversations between Axon and the Dominican Republic teams continued during the 2022 Caribbean Series held in Santo Domingo and were expanded to include a team from Colombia.  Although a preliminary agreement for the tournament was drafted, Flores ordered Cangrejeros LLC to "cease and desist" from promoting the Puerto Rico-Colombia Classic on March 29, 2022, as part of the conspiracy to suppress competition from the Cangrejeros Franchise.

48.    On information and belief, Defendants entered into their conspiracy to suppress economic competition from the Cangrejeros Franchise because they did not want to face enhanced economic competition in the relevant markets for investing in and operating a top-tier professional baseball team in Puerto Rico.  Other investor-operators of the League franchises lacked or did not desire to make the type of investments that Axon was willing to make to compete with the

15

Cangrejeros Franchise. Their objective, instead, was to remove Axon from his control over the franchise and replace him and Cangrejeros LLC with a more pliable investor-operator who would not seek to aggressively compete with the other franchises in the relevant markets.

**D.** **Defendants Conspire to Remove Axon from the Cangrejeros Franchise and Boycott Him and Cangrejeros LLC in the Relevant Markets**

49.    One of the ways in which Plaintiffs sought to increase the competitiveness of the Cangrejeros Franchise was to develop a plan to invest approximately $2 million in the dilapidated Bithorn stadium, which is owned by the Municipality of San Juan. The Bithorn has fallen into complete disrepair and lacked both a working scoreboard and adequate running water.

50.    While Defendants should have applauded such efforts, which would improve the experience of fans, sponsors, and players, they instead seized upon this proposed investment as a trigger for implementing their conspiracy to remove Plaintiffs from operation of the Cangrejeros Franchise.

51.    The extremely poor conditions at the Bithorn were a source of frustration for players, fans, and sponsors. Indeed, the conditions were so bad that they did not comport with the Winter League Facility Standards and Compliance Inspection Procedures set forth in the Winter League Agreement.

52.    On February 18, 2022, Axon's counsel sent a letter to Mayor Romero Lugo on behalf of Cangrejeros LLC to address a leaked communication detailing the depleted state of the Bithorn and to explain that Axon's proposals to upgrade the stadium stemmed from a desire to "make [the Bithorn] a living and visible monument to a cornerstone of Puerto Rico's proud history and sports culture." In the letter, Axon proposed that Cangrejeros LLC perform repairs of the stadium, through an estimated $2 million investment, in exchange for an exclusive fifteen-year lease of the venue to the Cangrejeros Franchise. Under the proposal, revenues from events at the

stadium would be split equally between the Municipality of San Juan and Cangrejeros LLC, with Cangrejeros LLC continuing to pay market rent to San Juan.

53.    Co-conspirator Romero Lugo, on behalf of San Juan, rejected this proposal in a press release without any prior notice to Axon or Cangrejeros LLC.

54.    Frustrated by San Juan's rejection, on March 8, 2022, Cangrejeros LLC informed Defendant Flores that the rapidly deteriorating conditions at the Bithorn necessitated consideration of a relocation for the franchise to another stadium in Puerto Rico and that an option had arisen for the Cangrejeros Franchise to play its games at a stadium in better shape in the Municipality of Humacao.

55.    In a press conference held on March 10, 2022, Axon announced that he would no longer accept a municipal sponsorship from San Juan for the Bithorn, which was inadequate to provide necessary improvements.  Axon had previously communicated this message at a League Board meeting on February 22, 2022, as he thought it was important for the teams and the League to seek private investments in their stadiums, which would lead to increased ticket revenues and a better experience for players, sponsors, and fans.

56.    In his public statement, Axon referenced the Bithorn's numerous defects, the negative impact of these defects on player performance and fan engagement, and San Juan's failure to correct these defects or to provide adequate funds to do so.  He further stated that San Juan's repeated failure to invest in the Bithorn and San Juan's unwillingness to collaborate with the Cangrejeros Franchise on proposed solutions had necessitated the contemplated movement of the team to a different stadium in another municipality.

57.    Axon's comments at the press conference reflected his disappointment in the quality of product he could offer in the Bithorn stadium in light of San Juan's failed promises to

maintain the Bithorn to the standards of professional baseball and its refusal to consider his $2 million private investment proposal.  Axon acted within his rights and pursuant to his responsibilities under the investor-operator agreement with the League to obtain quality stadium conditions that were required for the play of professional baseball games and necessary to provide a positive experience for players and fans.  Axon and Cangrejeros LLC hoped the press conference would encourage the League to serve as a partner in their efforts to have San Juan fulfill its obligations to improve the stadium or, if San Juan continued to resist, to move the team to another municipality.

58.    Instead of receiving support from the League for their efforts to improve stadium conditions, Plaintiffs found themselves the target of a conspiracy to eliminate them as a competitor. Defendant Flores, acting, on information and belief, in concert with the mayor of San Juan, and with the agreement of the Investor-Operator Defendants who sought to restrict competition from the Cangrejeros Franchise, immediately took steps to force Axon to relinquish his control over the Cangrejeros Franchise.

59.    Specifically, Flores sent Axon a letter dated March 14, 2022, pronouncing that Axon had engaged in conduct "detrimental to baseball" and to the League in violation of Section 8.02 of the League Constitution.  Based on such purportedly "detrimental acts," Flores ordered the Cangrejeros Franchise to remove Axon (its sole owner, chairman, and Delegate in Property) both from the League Board and as a shareholder of the Cangrejeros Franchise, on pain of termination of the investor-operator agreement between Cangrejeros LLC and the League.

60.    Simultaneously, Flores wrote to the Municipality of Humacao to interfere with any attempt by Cangrejeros LLC to relocate the Cangrejeros Franchise to that city, stating that the League did not endorse the transfer of the Cangrejeros Franchise to Humacao.

61.    Cangrejeros LLC responded to Flores through a letter, dated March 17, 2022, challenging the assertion that Axon had engaged in any acts detrimental to the League, and invited Flores to join the Cangrejeros Franchise in its efforts to obtain better stadium facilities for players, League franchises, and fans.

62.    Flores, however, was determined to carry out his conspiracy with the mayor of San Juan and the other Defendants to force Axon out of his control position for the Cangrejeros Franchise so that the team would: (a) cease its aggressive competition with the other teams in the relevant markets; (b) stay in San Juan without pressuring the municipality to make significant stadium improvements that Plaintiffs were willing to help finance, but that the mayor opposed; and (c) rely on the municipality to do the bare minimum in stadium improvements without private investment.

63.    The following day, Flores called a special meeting of the Board of the League, in the absence of Axon despite his request to attend, to discuss the Cangrejeros Franchise and sanctions against Axon.

64.    On March 29, 2022, Flores informed Axon that by agreement of the Board members—the competing investor-operators who controlled the other franchises—he had been suspended from all functions and participation in the Cangrejeros Franchise and the League for two years, fined $5,000.00, and placed on probation for one year after expiration of the suspension.

**E.    Axon's Action Seeking a Preliminary Injunction in Puerto Rico Superior Court to Prevent His Suspension from Operating the Cangrejeros Franchise**

65.    Axon sought a preliminary injunction of the sanctions levied against him by the competing Board members of the League pursuant to Rule 57 of the Puerto Rico Rules of Civil Procedure in the Superior Court of San Juan on April 11, 2022.  He argued, in support of the

motion, that permitting his suspension to go forward would freeze the Cangrejeros Franchise's access to capital and result in the cessation of club operations.

66.     A hearing was held on the preliminary injunction motion on April 22, 2022.  The Superior Court interpreted section 3.01 of the Constitution, which states that "shareholders and official representatives must be accepted by the Boar[d]" to constitute "members" of the League, to conclude that Axon was not the Delegate or the Alternate Delegate representing the Cangrejeros Franchise on the Board at the time of his suspension and therefore was not a member of the League. As such, the court determined that Cangrejeros LLC, rather than Axon, was the Board member afforded the protections of sections 3.05 and 3.06 of the Constitution, which specify the grounds for termination of membership and procedures for member separation.  The Superior Court then found that the Board of the League had the power to suspend Axon, as a nonmember of the League, and denied Axon's motion for a preliminary injunction.

**F.     Defendants Carry Out Their Conspiracy to Permanently Expel Axon from Competing and to Seize the Investor-Operator Interests of Cangrejeros LLC in the Cangrejeros Franchise**

67.     On May 17, 2022, Flores informed Plaintiffs that the League was seizing the investor-operator interests of Cangrejeros LLC in the Cangrejeros Franchise, pursuant to section 3.06 of the Constitution, based on Axon's filing of his claims in Puerto Rico Superior Court in response to the sanctions the League imposed against him.  According to Flores, Axon's filing of a legal action against the League, in which Axon allegedly made false representations regarding his membership in the League, was a violation of the investor-operating agreement and, as such, section 13.02 of the Constitution permitted the League Board to permanently terminate the interests of Cangrejeros LLC in the Cangrejeros Franchise.

68.     This concerted action by the League, its competing investor-operators, and Mayor Romero Lugo stripped Axon and Cangrejeros LLC of their rights to invest in and operate the

Cangrejeros Franchise and transferred their rights to operate and profit from the franchise back to the League without any compensation or due process of law. On information and belief, Defendants already knew that they had a more compliant investor-operator lined up to take control of the Cangrejeros Franchise in Defendant Impulse Sports, which would not provide aggressive competition to the other teams or pressure San Juan to permit or provide investment, or to make all the necessary improvements, to its stadium or face losing the team to another municipality. Although, upon information and belief, its organizers had been in communication with Flores and the League about taking control of the Cangrejeros Franchise for several months, Impulse Sports formally organized as a corporation on May 20, 2022.

69.    A virtual meeting of the League Board, with the competing investor-operators in attendance, was held on May 31, 2022. Axon sought permission to testify at the virtual meeting to oppose his being stripped of the investor-operator interests owned by Cangrejeros LLC. This request was denied.

70.    Raul Rodríguez of the Criollos, José Feliciano and Juan Carlos Ramírez of the Indios, Rivera and Suárez of the Cangrejeros, Javier Hernández of the Gigantes, Roberto Alomar and Marisol Irizarry of RA12, and Oscar Misla Villalba of the Leones were present at the meeting.

71.    Rivera argued on behalf of Cangrejeros LLC, explaining Axon's and Cangrejeros LLC's substantial investments in the development of the Cangrejeros team and even offering that Cangrejeros LLC would accept the sanctions imposed on Axon personally in the form of a two-year suspension in exchange for the League not seeking to terminate the investor-operator rights of Cangrejeros LLC.

72.    But the Defendants had no intention of permitting Cangrejeros LLC to continue to operate the Cangrejeros Franchise in strong economic competition with the other investor-

operators and in opposition to the position of the Municipality of San Juan to resist making all of the needed improvements in the Bithorn stadium.

73.    Instead, the competing investor-operator Defendants on the Board agreed to unanimously ratify the proposal of Defendant Flores to terminate the investor-operating agreement of Cangrejeros LLC and to seize all of Plaintiffs' economic and operation rights in the franchise without any compensation or due process of law.  The City of San Juan, through its mayor, participated in, and encouraged, this unlawful conspiracy.

**G.    The Investor-Operator Rights in the Cangrejeros Franchise Are Granted to Defendant Impulse Sports**

74.    On June 5, 2022, Defendant Flores reported that the League was accepting proposals for a new investor-operator for the Cangrejeros Franchise.  Flores acknowledged that two entities had already expressed interest in becoming the investor-operator for the franchise in February 2022, several months before Flores and the investor-operator Defendants seized upon Axon's statements about possibly moving the Cangrejeros Franchise from the deteriorating Bithorn stadium in San Juan as the stated basis for suspending him.

75.    On or about June 13, 2022, just weeks after the seizure of Plaintiffs' interests in the franchise, the League announced that it had selected Impulse Sports to become the new investor-operator of the Cangrejeros Franchise.

76.    Impulse Sports had filed for incorporation in Puerto Rico on May 20, 2022—eleven days before the League and its co-conspirators terminated Cangrejeros LLC's interests in the Cangrejeros Franchise as an investor-operator.  On information and belief, Impulse Sports had already entered into discussions with one or more of the other Defendants and/or co-conspirators about becoming the new investor-operator of the Cangrejeros Franchise to take over the interests that were going to be seized from Plaintiffs without compensation by the League.

77. Once Impulse Sports gained control of the Cangrejeros Franchise, it was quick to publicize its intentions to strengthen the Franchise's ties to the mayor of San Juan, co-conspirator Romero Lugo.  On July 7, 2022, when Impulse Sports was introduced as the new owner of the Cangrejeros Franchise, Mayor Romero Lugo participated in the announcement and sat alongside Impulse Sports in a show of government support.  At the press conference, Impulse Sports stated that it would be "strengthening ties with the mayor," which was one of the objectives of the unlawful conspiracy.  In response, co-conspirator Romero Lugo stated that the Bithorn stadium would be made ready for the upcoming season.

78. On information and belief, Impulse Sports agreed with the other Defendants to participate in the conspiracy to remove Axon and Cangrejeros LLC from having any investment or rights in the Cangrejeros Franchise, and to substitute Impulse Sports as the new investor-operator, which would be committed to keeping the team in San Juan, despite the deteriorating stadium, and which would not engage in the same type of aggressive economic competition with other investor-operators as had been conducted by Plaintiffs.

## INTERSTATE TRADE, COMMERCE, AND CONDUCT

79. Defendants' contracts, combinations, and conspiracies that are the subject of this Complaint are within the flow of, and substantially affect, interstate and international commerce.

80. Defendants engage in the business of controlling and operating top-tier professional baseball teams, including the recruitment of players and coaches, and the sale of tickets, sponsorships, radio, and streaming broadcast rights for the exhibition of the individual and collective professional talents of the baseball players on each such team.

81. Defendants' operation of the League and its franchises involves a significant volume of interstate and international commerce, including radio, streaming, and broadcast of games (to both domestic fans and fans in the continental United States), advertisements, travel

(e.g., to the Caribbean Series), communications, ticket sales, merchandise and apparel sales (including apparel sales in the continental United States), employment of players and coaches who travel to Puerto Rico from the continental United States and elsewhere, promotional activities, the purchase and transportation of equipment, and negotiations that result in the aforementioned activities.

82.    Defendants' above-described interstate and international business activities involve significant aggregate annual expenditures and revenues in the millions of dollars.

83.    Defendants' above-described activities benefit from the use of instrumentalities of interstate and international commerce, payments for those activities are made by instrumentalities of interstate and international commerce, and the activities have direct, substantial, and reasonably foreseeable effects on commerce in the United States and international import commerce with the United States.

### RELEVANT MARKETS AND MARKET POWER

84.    The relevant product and geographic markets in which Defendants' conduct has unreasonably restrained trade and reduced competition are: (a) the investment and operations market for top-tier professional baseball teams located in Puerto Rico; and (b) the related markets for players, game-day tickets, concessions sales, merchandise sales, radio and streaming broadcast rights, sponsorship rights, and for investing in a top-tier Puerto Rican professional baseball team.

85.    As described above, the League and Investor-Operator Defendants monopolize and control entry into these relevant markets.  The Investor-Operator Defendants also compete with each other in these markets and previously competed with Plaintiffs, before Plaintiffs were excluded from these relevant markets.

86.    The participants in the relevant markets are the separately owned investor-operators of the six teams in the League, as well as individuals who desire to enter or re-enter the relevant

markets, such as Plaintiffs.  Plaintiffs previously participated in these relevant markets through their investor-operator control of the Cangrejeros Franchise but have been excluded from these markets by virtue of the anticompetitive conspiracy of the Defendants.

87.    The relevant product of top-tier professional baseball in Puerto Rico is not interchangeable with other sports or entertainment products in Puerto Rico, as fans, sponsors, radio and streaming rights broadcasters, investors, and players of top-tier professional baseball in Puerto Rico do not view other sports or entertainment as close substitutes.

88.    The Puerto Rico Independent Baseball League and the Liga de Béisbol Superior Doble A de Puerto Rico—the semi-professional baseball leagues in Puerto Rico—are not substitutes in the relevant markets because they are not top-tier, do not employ the same quality of players, play a short season in the late summer to fall at a different time from the League, and have no opportunity to play in the prestigious Caribbean Series.

89.    There is no cross-elasticity of demand between top-tier professional baseball in Puerto Rico and any other sports or entertainment product in Puerto Rico.  Fans, sponsors, players, radio and streaming rights broadcasters, and investors do not view any other sports or entertainment product in Puerto Rico as being interchangeable with the product of top-tier professional baseball in Puerto Rico.

90.    The relevant geographic market is limited to Puerto Rico as tickets for live attendance in Puerto Rico, and in stadium sponsorship, are not interchangeable with tickets or in-stadium sponsorships to top-tier professional baseball games outside of Puerto Rico.  No other geographic location is able to reach fans of professional baseball who live in Puerto Rico with live attendance and sponsorship opportunities.  Moreover, individuals who wish to invest in and operate a top-tier professional baseball team in Puerto Rico do not view such an investment as

25

being interchangeable with investing in other professional baseball businesses outside of Puerto Rico because such businesses do not have the same connection to Puerto Rico baseball and its fans that such investors wish to obtain.

91.    Professional baseball teams in other Caribbean countries or in the Americas are not substitutes in the market for top-tier professional baseball in Puerto Rico.  Those teams do not play their games in Puerto Rico and do not generally have local contacts with fans or sponsors in Puerto Rico.  Non-Puerto Rican professional baseball teams and the leagues to which they belong do not compete in the Puerto Rico market for game-day tickets, concessions sales, merchandise sales, and sponsorship rights.  There is no cross-elasticity of demand between such professional baseball leagues and teams outside of Puerto Rico and the League and its teams in Puerto Rico.

92.    The League and its investor-operators have collective monopoly power in the relevant markets.  In fact, they are the only current competitors in these markets and have the ability to control and exclude entry into these markets.  The League and its investor-operators exercise control over who, when, and where any individuals and entities may enter the relevant markets as investor-operators of franchises and also control and limit the total number of League franchises that will be available to compete in the relevant markets.  Accordingly, the League and the Investor-Operator Defendants collectively possess and maintain a 100 percent market share in the relevant markets and conspire with each other and the other Defendants to maintain this power through exclusionary and anticompetitive agreements.

93.    Barriers to entry in the form of a limited number of suitable stadiums and availability of players of a sufficient quality prevent entry of another league (and group of teams) into the top-tier professional baseball market in Puerto Rico.

26

## ANTITRUST INJURIES SUFFERED BY PLAINTIFFS AND BY FANS, BUSINESS PARTNERS, PLAYERS, AND COMMUNITIES

### A.      Antitrust Injuries to Plaintiffs

94.      The concerted actions of the Defendants have caused severe antitrust injury and competitive harm to Axon, Cangrejeros LLC, and Santurce Merchandising.  Plaintiffs have been excluded from competing in the relevant markets and thus deprived of the total value of their investments and ability to profit from the various rights of the Cangrejeros Franchise.  These injuries include the loss of Plaintiffs' ability to derive competitive value from the ticket sales, sponsorship, concessions, merchandise, and radio and streaming broadcast rights of the Cangrejeros Franchise, and the loss of the ability to compete in the relevant markets through the operation of a professional baseball team in Puerto Rico.  Because Defendants control entry into these markets, it is not possible for Plaintiffs to compete in the face of the conspiracy by Defendants to exclude them from these markets.

95.      Plaintiffs Axon and Cangrejeros LLC have also been injured through the loss of their vested property and investment interests in the rights to operate the Cangrejeros Franchise. These rights include the ability to invest in and expand the value of the Cangrejeros Franchise's intellectual property and trademarks, as well as the ability to transfer and sell their interests in the Franchise to another investor that wishes to enter the relevant markets.  Plaintiff Santurce Merchandising has suffered lost profits as a result of being deprived of the ability to exploit various rights of the Cangrejeros Franchise in the relevant markets.

### B.      Competitive Harm to Fans, Business Partners, Players, and Communities

96.      Defendants' anticompetitive conduct has also caused significant competitive harm to the fans of the teams in the League.  The quality of play in the league will be lower absent the competition provided by Plaintiffs, the quality of the Bithorn for the Cangrejeros Franchise will

be lower absent the efforts of Plaintiffs to invest in and improve that stadium, and the output of streaming and radio broadcasts and merchandise will be reduced for fans without the enhanced competition provided by Plaintiffs.

97.    Business partners who are sponsors, merchandise sellers, and purchasers of radio and streaming broadcast rights will also suffer competitive injury by the lower quality of league games absent the enhanced competition provided by Plaintiffs.  And players will receive lower salaries and benefits in the labor market absent the enhanced competition provided by Plaintiffs in that labor market.

98.    The Puerto Rico communities served by the League will suffer anticompetitive harm from Defendants' unlawful concerted action.  For example, other Puerto Rican cities that do not currently have a League team will be injured by being deprived of the competitive opportunity to attract such a team, which they had when Plaintiffs were competing to improve the quality of the stadium in which the Cangrejeros Franchise played.  Such stadium improvements would also lead, through competition, to stadium improvements in other communities in which the League teams play, improving the fan and sponsor experience in such stadiums.

## MAJOR LEAGUE BASEBALL'S JUDICIALLY CREATED ANTITRUST EXEMPTION IS NOT APPLICABLE TO THIS CASE

99.    MLB's judicially created exemption immunizing MLB's "business of baseball" from federal antitrust laws does not apply to the conduct by Defendants at issue in this case.  First, the exemption has no application to the business of the League and its investor-operators, which are neither MLB nor an affiliate minor league or teams of MLB.  Rather, the League is wholly independent and merely agrees to abide by certain MLB standards for having MLB players eligible to participate in Winter League games.  The courts have made it clear that the anomalous

exemption for the baseball business of MLB will not be applied to any other sports league business or its teams.

100.    Second, even if the exemptions could theoretically apply to certain business of baseball conduct of the League and its investor-operators, it cannot apply to the conspiracy at issue here, which is not conduct necessary for or even related to the joint production of baseball games.

101.    The recent decision of the United States Supreme Court in *Alston*, and the recent Statement of Interest of the United States Department of Justice, make it clear that the so-called "baseball exemption" for MLB may not be extended to the type of conduct challenged in this case—where a conspiracy is being engaged in by investor-operators in the League for the anticompetitive purpose of suppressing competition, rather than engaging in necessary cooperation to jointly conduct baseball games.  *See Nat'l Coll. Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2159 (2021), and DOJ Statement of Interest, STATEMENT OF INTEREST OF THE UNITED STATES at 1, 4–7, *Nostalgic Partners, LLC v. The Office of Baseball*, No. 1:21-cv-10876-ALC, (S.D.N.Y. June 15, 2022), ECF No. 35.

102.    Third, there is no baseball exemption to the Civil Rights Act, the Puerto Rico antitrust or fair competition laws, or the tort of Contracts in Prejudice of a Third Party.  Nor is there any need for nationwide uniformity in applying the Puerto Rico antitrust or fair competition laws to the conduct of Defendants, as the League only conducts its games in Puerto Rico and the location of the Caribbean Series, not in any other State.  The Commerce Clause thus does not require that any baseball exemption be applied to the Puerto Rico antitrust or fair competition laws, even if it were to be applied to the federal antitrust claims against Defendants (which should not be the case).

## CLAIMS FOR RELIEF

## COUNT ONE

## Violations of Section 1 of the Sherman Act: Agreement Among Defendants in Unreasonable Restraint of Competition

103.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

104.    The League and its investor-operators are each separate economic actors that do not share profits and losses with each other or otherwise compete as a single economic entity in the relevant markets.  Each investor-operator of a franchise of the League has separate economic interests and competes with each other economically for fans, sponsors, investors, radio and streaming broadcasters, and player talent.  Indeed, a key motivation of the other investor-operators in the anticompetitive conspiracy to exclude Plaintiffs from the relevant markets is to eliminate the aggressive competition Plaintiffs have provided to the Investor-Operator Defendants in these markets.  The concerted actions of the League and its investor-operators, organized by the conspiratorial acts of its president, constitute a contract, combination, or conspiracy subject to Section 1 of the Sherman Act.

105.    Defendants have entered into a continuing conspiracy in unreasonable restraint of trade to boycott and exclude Plaintiffs from the relevant markets and to replace them with a more malleable competitor in Impulse Sports.  The purpose and effect of this conspiracy is to reduce horizontal competition among the investor-operators and the franchises they control in the relevant markets set forth in paragraphs 84 to 93 above.  The League and its president are the organizers of this conspiracy in restraint of trade.

106.    The conspiracy by Defendants will reduce product quality and output in the relevant markets.  It also has no procompetitive justification.  Accordingly, the concerted conduct

constitutes a violation of Section 1 of the Sherman Act whether viewed under the per se rule applicable to group boycotts or a rule of reason analysis.

107.    The agreement between the League, its president, and the League's investor-operators has had significant anticompetitive effects in the relevant markets set forth in the Complaint, resulting in antitrust injury to Plaintiffs, as well as competitive harm to fans, sponsors, players, merchandisers, radio and streaming rights broadcasters, and communities.    This competitive harm has included reduced output and lower product quality for top-tier professional baseball games in Puerto Rico.

108.    Even if there were any procompetitive purpose for the anticompetitive concerted action of Defendants (there is none), reasonable, less restrictive alternatives would exist to achieve such a purpose rather than the total exclusion of Plaintiffs from the relevant markets.    As a result, the participation of Defendants in the challenged agreement would, in all events, constitute a violation of Section 1 of the Sherman Act under a rule-of-reason analysis.

109.    The anticompetitive concerted actions of Defendants have directly and proximately caused antitrust injury and damages to the business and property of Plaintiffs.    Plaintiffs were participants in the relevant markets and were, in fact, the specifically intended targets of Defendants' anticompetitive agreement.

110.    Plaintiffs have already suffered significant antitrust injury and damages to their business and property as a result of being prevented, by the anticompetitive agreement of the Defendants, from being able to continue to participate in the relevant markets.    Plaintiffs are entitled to an award of treble damages, in an amount to be proven at trial, for the injuries they have suffered as a result of Defendants' agreement in violation of Section 1 of the Sherman Act.

31

Plaintiffs are also entitled to injunctive relief to end Defendants' unlawful conspiracy and restore competition to the relevant markets.

## **COUNT TWO**

### **Violations of Section 2 of the Sherman Act: Conspiracy or Combination to Monopolize, Monopolization, and Attempted Monopolization**

111. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

112. Defendants are each separate economic actors, as further alleged above.

113. All Defendants have entered into a continuing combination or conspiracy with the specific intent of acquiring and maintaining monopoly power in the relevant markets for top-tier professional baseball teams set forth in paragraphs 84 to 93 above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

114. Defendant League and its investor-operators have a 100 percent share of the relevant markets and exercise their monopoly power by controlling entry into those markets. Barriers to entry prevent any other top-tier professional baseball league and teams from forming and entering the relevant markets.

115. Defendants' anticompetitive conspiracy has maintained Defendants' monopoly power by excluding Plaintiffs from the relevant markets and from providing increased competition to Defendants in the relevant markets.

116. All Defendants have thus engaged in an unlawful combination or conspiracy to monopolize in violation of Section 2 of the Sherman Act.

117. In addition, even if Defendants were found to be operating as a single economic entity with the League for purposes of the Sherman Act, the League and its investor-operators

would then still be in violation of Section 2 of the Sherman Act for actual or attempted monopolization (which does not require concerted action among separate economic entities).

118.    The League has engaged in exclusionary and anticompetitive actions against Plaintiffs, as set forth above, with the specific intent of obtaining and maintaining monopoly power in the relevant markets without any procompetitive justification.  Such conduct constitutes actual monopolization and/or attempted monopolization, each in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

119.    The conduct by Defendants in violation of Section 2 of the Sherman Act has reduced product quality and output in the relevant markets.

120.    The conduct by Defendants in violation of Section 2 of the Sherman Act has had significant anticompetitive effects in the relevant markets set forth in the Complaint, resulting in antitrust injury to Plaintiffs, as well as competitive harm to fans, sponsors, radio and streaming rights broadcasters, merchandisers, players, and communities.

121.    Defendants' exclusionary and anticompetitive conduct in violation of Section 2 of the Sherman Act has directly and proximately caused antitrust injury and damages to the business and property of Plaintiffs.  Plaintiffs were participants in the relevant markets and were, in fact, the specifically intended targets of Defendants' anticompetitive monopolization conduct.

122.    Plaintiffs have already suffered significant antitrust injury and damages to their business and property as a result of Defendants' unlawful conduct in violation of Section 2 of the Sherman Act, including by being prevented from continuing to compete in the relevant markets. Plaintiffs are entitled to an award of treble damages, in an amount to be proven at trial, for the injuries they have suffered as a result of Defendants' violation of Section 2 of the Sherman Act.

Plaintiffs are also entitled to injunctive relief to end Defendants' unlawful monopolization conduct and to restore competition to the relevant markets.

### COUNT THREE

### Violations of the Antitrust Law of Puerto Rico (P.R. Laws Ann. tit. 10, § 258): Agreement Among Defendants in Unreasonable Restraint of Competition

123.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

124.    Defendants are each separate economic actors, as further alleged above.

125.    The concerted actions of the League and its investor-operators, organized by the conspiratorial acts of its president, constitute an unreasonable restraint of trade in violation of the antitrust law of Puerto Rico, P.R. Laws Ann. tit. 10, § 258.

126.    As further alleged above, Defendants have entered into a continuing conspiracy in unreasonable restraint of trade to boycott and exclude Plaintiffs from the relevant markets and to replace them with a more malleable competitor in Impulse Sports.  The purpose and effect of this conspiracy is to reduce horizontal competition among the investor-operators and the franchises they control in the relevant markets set forth in paragraphs 84 to 93 above.  The League and its president are the organizers of this conspiracy in restraint of trade.

127.    As further alleged above, the conspiracy by Defendants will reduce product quality and output in the relevant markets and has no procompetitive justification.  Moreover, if there were any procompetitive purpose for the alleged conspiracy, it could reasonably be achieved through much less restrictive alternatives than Plaintiffs' exclusion from the relevant markets.

128.    As further alleged above, the anticompetitive concerted actions of Defendants have directly and proximately caused antitrust injury and damages to the business and property of Plaintiffs.

34

129.    Defendants' illegal conduct substantially affected and/or restrained commerce, trade, and consumers in Puerto Rico.

130.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of P.R. Laws Ann. tit. 10, § 258.

131.    By reason of Defendants' violation of the antitrust law of Puerto Rico, Plaintiffs have suffered monetary damages and loss of going-concern value.  Plaintiffs have been deprived of the revenue and profits they would have otherwise made but for Defendants' illegal conduct. Plaintiffs are therefore entitled to recover treble damages for the harm suffered, plus costs and attorneys' fees.  P.R. Laws Ann. tit. 10, § 268(a).

132.    Plaintiffs are also entitled to injunctive relief to end Defendants' violations of the Puerto Rico antitrust law and to restore competition to the relevant markets.

## COUNT FOUR

### Violations of the Antitrust Law of Puerto Rico (P.R. Laws Ann. tit. 10, § 260): Conspiracy or Combination to Monopolize, Monopolization, and Attempted Monopolization

133.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

134.    Defendants are each separate economic actors, as further alleged above.

135.    As further alleged above, all Defendants have entered into a continuing combination or conspiracy with the specific intent of acquiring and maintaining monopoly power in the relevant markets set forth in paragraphs 84 to 93 above, in violation of Section 4 of the antitrust law of Puerto Rico, P.R. Laws Ann. tit. 10, § 260.

136.    As further alleged above, Defendant League and its investor-operators have a 100 percent share of the relevant markets and exercise their monopoly power by controlling entry into those markets.

137.    As further alleged above, Defendants' anticompetitive conspiracy has maintained Defendants' monopoly power by excluding Plaintiffs from the relevant markets and by preventing them from providing increased competition to Defendants in the relevant markets.

138.    Defendants have thus engaged in an unlawful combination or conspiracy to monopolize in violation of section 260 of the antitrust law of Puerto Rico.

139.    As further alleged above, the League and its investors-operators have engaged in exclusionary and anticompetitive actions against Plaintiffs with the specific intent of obtaining and maintaining monopoly power in the relevant markets without any procompetitive justification. Such conduct constitutes actual monopolization and/or attempted monopolization in violation of section 260 of the antitrust law of Puerto Rico, even if these Defendants were to be viewed as a single economic entity.

140.    As further alleged above, the conduct by Defendants in violation of section 260 of the antitrust law of Puerto Rico has reduced product quality and output in the relevant markets.

141.    As further alleged above, the conduct by Defendants in violation of Section 260 has had significant anticompetitive effects in the relevant markets set forth in the Complaint, resulting in antitrust injury to Plaintiffs, as well competitive harm to fans, sponsors, radio and streaming rights broadcasters, merchandisers, players, and communities.

142.    By reason of Defendants' violation of the antitrust law of Puerto Rico, Plaintiffs have suffered monetary damages and loss of going concern value.  Plaintiffs have been deprived of the revenue and profits they would have otherwise made but for Defendants' illegal conduct. Plaintiffs are therefore entitled to recover treble damages for the harm suffered, plus costs and attorneys' fees.  P.R. Laws Ann. tit. 10, § 268(a).

36

143.    Plaintiffs are also entitled to injunctive relief to end Defendants' violations of the Puerto Rico antitrust law and to restore competition to the relevant markets.

## COUNT FIVE

### Violations of Fair Competition, P.R. Laws Ann. tit. 10, § 259, and Article 1536 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 10801 and 10803

144.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

145.    Article 1536 of the Puerto Rico Civil Code of 2020 establishes that whoever by act or omission causes harm to another, through fault or negligence, will be obligated to repair the damage caused.

146.    Defendants have entered into a continuing combination or conspiracy that amounts to unfair methods of competition and/or deceptive acts and practices in trade and commerce in Puerto Rico, as defined and provided under P.R. Laws Ann. tit. 10, § 259.

147.    Defendants violated the Fair Competition Law of Puerto Rico, P.R. Laws Ann. tit. 10, § 259, by engaging in unfair methods of competition and/or unfair deceptive acts and practices that have caused injuries to the business and property of Plaintiffs.  Defendants' unlawful practices include:

      a.    Violations of statutory laws, including 15 U.S.C. §§ 1 and 2, 42 U.S.C. § 1983, and P.R. Laws Ann. tit. 10, §§ 259 and 260, the common law, or other established concepts of unfairness; and/or

      b.    Immoral, unethical, oppressive, or unscrupulous acts throughout Puerto Rico; and/or

c.  Depriving Plaintiffs of free and open competition in the relevant markets for investing in, managing, and operating top-tier professional baseball teams in Puerto Rico; and/or

d.  Entering into agreements that constitute Contracts in Prejudice of a Third Person.

148.  Defendants' intentional and/or negligent violation of P.R. Laws Ann. tit. 10, §§ 259 and 260 constitutes fault or negligence as those terms are defined in Article 1163 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, § 9315, and interpreted under Article 1536, P.R. Laws Ann. tit. 31, § 10801, and its predecessor, Article 1802 of the Civil Code of 1930, P.R. Laws Ann. tit. 31, § 5141 (repealed), and those acts have caused Plaintiffs to suffer injury and damages.

149.  Plaintiffs are entitled to compensatory damages or restitution derived by Defendants from their willful and/or negligent acts or omissions pursuant to Article 1536 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 10801.

150.  Plaintiffs are also entitled to punitive damages, pursuant to Article 1538 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 10803, because Defendants have acted with malice and intent to defraud.

## COUNT SIX

### Contracts in Prejudice of a Third Person

151.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

152.  Upon information and belief, Defendants League, Flores, and one or more Investor-Operator Defendants, and one or more of the individuals who became the officers of Defendant

Impulse Sports, were in communication with each other between March of 2022 and June of 2022 with the specific intent of awarding the Cangrejeros Franchise to Impulse Sports.

153.    The individuals who became the officers of Defendant Impulse Sports at the time of those communications and, since May 20, 2022, Defendant Impulse Sports itself, knew that Plaintiffs owned the Cangrejeros Franchise before and during the period when those communications were taking place.

154.    Defendant League, Flores, and the Investor-Operator Defendants entered into an agreement with Defendant Impulse Sports to vest the Cangrejeros Franchise upon Impulse Sports, knowing that Cangrejeros LLC and Axon had a valid agreement as investor operators of the Cangrejeros Franchise that was unlawfully terminated.  Additionally, Defendants had actual knowledge that Axon and Cangrejeros LLC had vested certain of their rights pursuant to their investor-operator interest in Santurce Merchandising.

155.    The intent of Defendants was that the former agreement would supersede the latter agreement to the detriment of Cangrejeros LLC, Santurce Merchandising, and Axon.

156.    Neither the League nor Impulse Sports have compensated Plaintiffs in any way, and as a result of Defendants' agreement and their execution thereof, Plaintiffs have suffered actual injury and damages, including but not limited to, their loss of their investor-operator interest in the Cangrejeros Franchise and all economic and business opportunities relating to their exploitation and use thereof.

157.    The agreements between the Defendants constitute Contracts in Prejudice of a Third Person, as acknowledged by the Puerto Rico Supreme Court in *Dennis v. City Fed. Savings & Loan Ass'n*, 121 P.R. Dec. 197 (1988), under Puerto Rico's General Tort Statute.  As a result,

Plaintiffs are entitled to have Defendants' agreements voided, to have the Cangrejeros Franchise returned to Plaintiffs, and to be compensated for actual damages suffered.

## COUNT SEVEN

### Violations of Civil Rights Act of 1871, 42 U.S.C. § 1983

158.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

159.    Defendants conspired with one another and co-conspirator Romero Lugo, acting on behalf of the municipality of San Juan, to deprive Plaintiffs, without due process of law, of their property interests and rights, privileges, and immunities secured by the United States Constitution and laws of the United States under the color of government action by a municipality of Puerto Rico.  Defendants' conspiracy, with the participation of the mayor of San Juan acting on behalf of the municipality, deprived Axon and Cangrejeros LLC, without any due process or compensation, of their established property interest in being the investor-operator of the Cangrejeros Franchise and having control over the commercial exploitation of the team's various rights without affording them compensation or due process of law.

160.    Defendants, acting in concert with the mayor of the Municipality of San Juan, operated under the law and color of government authority in depriving Plaintiffs of their property interests in the Cangrejeros Franchise without due process of law in order to, among other things, accomplish the objective of San Juan to suppress requests by the Franchise for various improvements in its stadium, to suppress the proposal for a private investment in the stadium, and to eliminate the possibility that the team would move to another municipality in Puerto Rico.  There was no lawful justification for this conspiracy.

161.    The conduct of co-conspirator Romero Lugo, on behalf of the Municipality of San Juan and in coordination with Defendants, amounted to governmental compulsion and/or joint and symbiotic action by a state actor.

162.    The conspiracy by Defendants was also purposefully harmful, or at least recklessly indifferent, to Plaintiffs' federally protected property rights in continued operation of the Cangrejeros Franchise, in violation of 42 U.S.C. § 1983.

163.    As a direct and proximate result of Defendants' actions in violation of 42 U.S.C. § 1983, Plaintiffs have been deprived of their property rights without due process of law and are entitled to recover actual damages, costs, and attorneys' fees.  42 U.S.C. §§ 1983 and 1988.

164.    Defendants' conduct to deprive Plaintiffs of their property interest, under color of government authority, and without due process of law, has also been malicious and deceitful, entitling Plaintiffs to recover punitive damages.

165.    Plaintiffs are also entitled to injunctive relief to remedy Defendants' actions in violation of 42 U.S.C. § 1983 and restore Plaintiffs' protected property rights in the Franchise.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

A.    That the unlawful contracts, combinations, or conspiracies alleged herein, and the acts done in furtherance thereof by Defendants, be adjudged and decreed a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.    That the conspiracy or combination of Defendants to monopolize the relevant markets be adjudged to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C.    That the exclusionary and anticompetitive conduct of Defendant League (acting with its investor-operators) to acquire and maintain, or to attempt to acquire and

maintain, monopoly power in the relevant markets be adjudged to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.    That the exclusionary and anticompetitive conduct of Defendants be adjudged to be in violation of the Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 257, et seq.;

E.    That the Court enjoin Defendants from continuing to engage in conduct in violation of Sections 1 and 2 of the Sherman Act, and the antitrust law of Puerto Rico, and order Defendants to return the investor-operator interest for the Cangrejeros Franchise to Cangrejeros LLC, end the suspension of Axon, and require that any future attempt by the League to remove and/or suspend Axon and Cangrejeros LLC from the League and operations of the Cangrejeros Franchise be subject to a determination by an agreed-upon neutral arbitrator, so that the competition provided by Plaintiffs in the relevant markets can be fully restored;

F.    That judgment be entered for Plaintiffs against Defendants for three times the amount of damages sustained by Plaintiffs as allowed by Section 4 of the Clayton Act, 15 U.S.C. § 15, and the Puerto Rico antitrust law, P.R. Laws Ann. tit. 10, § 268, in an amount to be determined at trial, together with the costs of this action and reasonable attorneys' fees pursuant to the Clayton Act and the Puerto Rico antitrust law;

G.    That the unlawful and unfair methods of competition and/or deceptive acts and practices of Defendants be declared a violation of the Puerto Rico Fair Competition Law, P.R. Laws Ann. tit. 10, § 259 and Article 1536 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 10801;

H.  That judgment be entered for Plaintiffs against Defendants to compensate Plaintiffs for the amount of damages sustained by Plaintiffs and/or restitution from Defendants, and for punitive damages, pursuant to the Puerto Rico Fair Competition Law, P.R. Laws Ann. tit. 10, § 259 and Articles 1536 and 1538 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 10801 and 10803;

I.  That Defendants' agreements to strip Plaintiffs of the Cangrejeros Franchise and award it to Impulse Sports be declared contracts in prejudice of a third party and, thus, void under Puerto Rico law;

J.  That judgment be entered for Plaintiffs against Defendants to compensate Plaintiffs for the amount of damages sustained by Plaintiffs and/or restitution from Defendants, including return the investor-operator interest for the Cangrejeros Franchise to Cangrejeros LLC, and for punitive damages, under the tort of Contracts in Prejudice of a Third Party and pursuant to Articles 1536 and 1538 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 10801 and 10803;

K.  That the conspiratorial actions of Defendants be declared to be in concert with government officials and under color of law and to have deprived Plaintiffs of their property interests and rights, privileges, and immunities without due process of law, as secured by the United States Constitution and laws of the United States;

L.  That judgment be entered for Plaintiffs against Defendants for actual damages, punitive damages, costs, in an amount to be determined at trial, and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988;

M.  That the Court enjoin Defendants from continuing to engage in conduct in violation of Plaintiffs' civil rights under 42 U.S.C. § 1983 and order Defendants to return the

43

investor-operator interest for the Cangrejeros Franchise to Cangrejeros LLC and end the suspension of Axon;

N.    That Plaintiffs be awarded pre- and post-judgment interest to the maximum extent permitted by law; and

O.    That Plaintiffs be accorded such other, further, or different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: March 20, 2026                    By:

> /s/ Jeffrey L. Kessler
> Jeffrey L. Kessler (*pro hac vice*)
> Jeffrey J. Amato (*pro hac vice*)
> Lauren E. Duxstad (*pro hac vice*)
> Gabriela B. Wolk (*pro hac vice*)
> **WINSTON & STRAWN LLP**
> 200 Park Avenue
> New York, New York 10166
> Tel.: (212) 294-6700
> Fax: (212) 294-4700
> jkessler@winston.com
> jamato@winston.com
> lduxstad@winston.com
> gwolk@winston.com
>
> /s/ Carlos A. Rodríguez-Vidal
> Carlos A. Rodríguez-Vidal
> USDC-PR No. 201213
> **GOLDMAN ANTONETTI & CORDOVA, LLC**
> P.O. Box 70364
> San Juan, Puerto Rico 00936
> Tel.: (787) 759-4117
> Fax: (787) 767-9333
> crodriguez-vidal@gaclaw.com

44

45

*Counsel for Plaintiffs Cangrejeros de Santurce Baseball Club, LLC, Santurce Marketing LLC, and Thomas J. Axon*